IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 10–cv–01884–KMT–MEH


JAQUELYN ANN WHITTINGTON, individually and on behalf of all other persons similarly situated,

      Plaintiff,

v.

TACO BELL OF AMERICA, INC., and
TACO BELL CORP.,

Defendants.

---

## ORDER APPROVING SETTLEMENT

---

This matter is before the court on the parties' "Joint Motion for Approval of Collective Action Settlement" [Doc. No. 202] ("Joint Mot.").   On August 20, 2013, the court requested further briefing and information and the parties thereafter filed their "Joint Supplement to Joint Motion for Approval of Collective Action Settlement" [Doc. No. 208] ("Joint Supp.").

Plaintiff has asserted claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") and the Colorado Minimum Wage Act set forth at 7 CCR § 1103-1, arising out of Defendants' alleged failure to appropriately compensate Assistant General Managers ("AGMs") working at company-owned Taco Bell stores for hours worked in a given work week above 40. The claims were asserted as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of Plaintiff and other current and former employees who worked for Defendants as AGMs.

***Procedural History***

On September 16, 2011, named Plaintiff Whittington filed a Motion for Conditional

Certification [Doc. Nos. 61 and 62], seeking conditional certification of a nationwide (except for

California) collective of similarly situated individuals.   On January 10, 2012, the Court granted

Plaintiff's Motion for Conditional Certification and conditionally certified a collective of all

persons who are or were formerly employed as Assistant General Managers at a company-owned

Taco Bell restaurant(s) in any state other than California at any time since January 10, 2009.

[Doc. No. 85.]   As of the date of the filing of the instant joint motion, 475 individuals have filed

consents to join the case as opt-in collective members asserting FLSA claims against Defendants.

***Legal Standard***

"Congress enacted the FLSA in 1938 with the goal of protect[ing] all covered workers

from substandard wages and oppressive working hours."   *Christopher v. SmithKline Beecham*

*Corp.*, --- U.S. ----, 132 S. Ct. 2156, 2162 (2012) (citation and internal quotation marks omitted).

The "prime purpose" in enacting the FLSA "was to aid the unprotected, unorganized and lowest

paid of the nation's working population; that is, those employees who lacked sufficient bargaining

power to secure for themselves a minimum subsistence wage."   *Brooklyn Savings Bank v. O'Neil*,

324 U.S. 697, 707 n.18 (1945).

To help further its goals, the FLSA provides that an employee or multiple employees may

bring an action "in behalf of himself or themselves and other employees similarly situated,"

thereby creating a collective action.   29 U.S.C. § 216(b).   The prosecuting employee or

employees may also "designate an agent or representative to maintain such action for and in behalf of all employees similarly situated." *Id*.

There is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by the FLSA Section 216(b).   In a Rule 23 proceeding, a class is first described and if the action is maintainable as a class action, each person within the description is considered to be a class member.   As such, each class member is bound by any judgment, whether favorable or unfavorable, until and unless he has "opted out" of the suit.   Under § 216(b) of the FLSA, on the other hand, no person can become a party plaintiff and no person will be bound by or may benefit from judgment unless he has affirmatively "opted into" the class, i.e., given his written, filed consent to join other members in the lawsuit.   *Grayson v. K Mart Corp*., 79 F.3d 1086, 1106 (11th Cir. 1996).   Thereafter, the collective plaintiffs are known as opt-ins. Additionally, "the requirements for satisfying Rule 23 are considerably more involved than is the unitary 'similarly situated' requirement of [§ 216(b)]." *Id*.

In this case the opt-in class has been defined and 475 individuals have voluntarily joined the collective.   The settlement has been structured so as to provide for notice and the ability to individually opt-out to each of the collective action opt-in members if they do not wish to be a beneficiary to or bound by the settlement agreement.   In effect, this is akin to an agreed upon negotiated settlement between Defendants and each individual opt-in member who will make his or her own decision whether to settle their claims under the terms of the settlement agreement. For the benefit of the parties, the court must scrutinize the proposed settlement documentation and make findings that the litigation involves a bona fide dispute and that the proposed settlement is

fair and equitable to all parties concerned and that it provides for an award of reasonable attorney's fees. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350,1354 (11th Cir. 1982). Further, "the Court must determine 'whether the settling plaintiff has used the class action claim for unfair personal aggrandizement in the settlement, with prejudice to absent putative class members.'" *Id*. at 3 (quoting *Shelton v. Pargo, Inc*., 582 F.2d 1298, 1314 (4th Cir. 1978)). Obviously, opt-in members may, if they choose, place some degree of reliance on the court's review.

## *Analysis*

### A.     *Certification of the Final Settlement Class*

The settlement for which the parties seek court approval was obtained in the context of a private action to recover unpaid wages.   If a settlement reflects a reasonable compromise over issues such as FLSA coverage or computation of back wages that are actually in dispute, a court may approve the settlement to promote the policy of encouraging settlement of litigation.   *See Lynn's Food Stores*, 679 F.2d at 1354.   "Where parties settle FLSA claims before the Court has made a final collective action ruling, the Court must make some final class certification finding before it can approve a collective action settlement."   *Peterson v. Mortgage Sources, Corp*., No. 08-2660-KHV, 2011 WL 3793963, at *4 (D. Kan. Aug. 25, 2011).   *See also Grayson*, 79 F.3d at 1096; *Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 993 (N. D. Ind. 2010); *Murillo v. Pac. Gas & Elec. Co.*, No. CIV. 2:08–1974 WBS GGH, 2010 WL 2889728, *2 (E. D. Cal. July 21, 2010).

On January 10, 2012, the Court entered its Preliminary Conditional Certification Order

[Doc. No. 85] certifying the following collective:

> All persons who are or were formerly employed as Assistant General Managers at a company-owned Taco Bell restaurant(s) in any state other than California at any time since January 10, 2009.

*Id*.   In order to initially certify this collective, the court considered at least the following

information which is now undisputed by Defendant:   Defendants classified every Assistant

General Manager ("AGM") at corporate-owned Taco Bells (other than in California) as exempt

from overtime, regardless of any other information such as the size of the restaurant at which an

AGM worked or the AGM's shift and hours.   (Mot. for Cond. Cert. [Doc. No. 62] at 6-7.)   The

AGMs were paid a fixed annual salary, and Defendants did not pay any of them overtime,

including the collective members who eventually opted into the case.   *See id.* at 3 (citing Answer

and Affirmative Defenses of Defendants [Doc. No. 13].)   Members of the putative collective were

typically scheduled to work more than 40 hours per week.   (Mot. for Cert. at 6.).   The putative

collective member AGMs were expected to perform in accordance with standardized job

descriptions, policies and procedures.

After conditional certification, Taco Bell's corporate representative testified at deposition

that the same job duties apply to all AGMs working in Taco Bell-owned restaurants across the

United States, pursuant to a standardized job description.   (*See id.* at 4; Rudich Decl., Exs. B-D.)

This standardized job description outlined all AGMs' duties and further set forth a uniform

performance assessment applicable to every AGM.   (*Id.* at 7.).   AGMs were also subject to a

standardized code of conduct.   (*Id.;* Rudich Decl., Ex. I.)   Further, the Taco Bell representative

5

testified that Taco Bell also used standardized materials to train AGMs at its corporate owned facilities.   (*Id.* at 5; Rudich Decl., Exs. B, G).   He stated that uniform job duties, descriptions, and training materials are used at each Taco Bell corporate-owned restaurant pursuant to a consistent corporate "concepts" program that details how employees, including AGMs, must approach "all aspects of restaurant operations."   (*Id.* at 5).   Taco Bell used a software program entitled the "Answer System" which provided detailed computerized guidance through "a set of books that tell Taco Bell Team Members how we run our restaurants."   (*Id.*)   The Answer System instructs AGMs on their specific duties by including "information you need and steps you must follow to do your job" in a myriad of functions, including store operations and team management.   (*Id.;* Rudich Decl., Ex. H).   This standardized guidance applies in every corporate-owned Taco Bell, and to every AGM in such a restaurant, regardless of size, location of facility, revenues, or any other factor.

Still other information came to light during discovery which was provided by some of the 475 opt-in collective members.   Plaintiffs submit, without contest from Defendants, that discovery responses provided by almost 400 opt-in AGMs provided the following additional information

> Each responding Opt-In reported working overtime weekly as an AGM, which is not surprising given that AGMs were scheduled to work at least 50 hours each week. Each claimed that overtime pay was unpaid and owed to them by Taco Bell, which is not surprising given that Taco Bell classified every Opt-In as exempt and paid none of them overtime. Each described the AGM work duties similarly, and stated that their conduct as an AGM was governed by corporate policies, leaving them with little or no discretion in how to perform any aspect of their jobs.

(Joint Supp. at 9.)

Based on the totality of the evidence submitted to this court, there is sufficient support that the opt-in AGMS have near identical job duties and responsibilities, perform those duties and responsibilities in similar, corporately directed ways and are paid in the same manner for all corporate owned Taco Bell locations.

The Tenth Circuit has approved a two-step approach to determine whether plaintiffs are "similarly situated" for purposes of the FLSA Section 216(b). *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir.2001). During the second stage analysis, the Court must consider the information already provided in the original decision to allow conditional certification and also several other factors including: (1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to the defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See id.* at 1103.

As to the first factor, the court finds that the employment settings of the individual plaintiffs were very similar. They all worked at corporate-owned Taco Bell restaurants and all were subject to the same set of rules and regulations governing almost every aspect of their jobs. There was little to no discretion over how any of the opt-in AGMs performed the various tasks assigned to them under the Answer System. As to the second factor, the defenses available to Defendants will be unified since it classified all the opt-in AGMs, without exception, the same, did not pay overtime to any opt-in AGM and required that all opt-in AGMs work more than 40 hours a week. Therefore the court finds that the opt-in collective members who would be covered by the

proposed settlement are similarly situated and that this settlement collective should be certified to proceed.[1]

### B.      Bona Fide Dispute

In their Complaint, Plaintiffs made detailed factual allegations describing Defendants' allegedly unlawful misclassification of the AGM position.   [Doc. No. 1.]   In their Answer [Doc. No. 13], Defendants denied Plaintiffs' material factual allegations and asserted a number of affirmative defenses that they argued would bar Plaintiffs' claims in whole, or in part.   At the time the parties reached agreement in the case, they had actively been litigating for almost three years, were embroiled in discovery disputes involving motions to compel before the court which are still pending and some 180 pleadings and other documents had been filed of record.   The parties assert that they had analyzed multiple legal issues implicated in this case, including whether and how the concept of a fluctuating workweek might be relevant to the claims, Department of Labor and other guidance and opinions concerning the role and classification of other positions that might be analogous to the AGM position at issue, application of the doctrines of good faith and willfulness to Defendants' conduct, as well as detailed consideration of other of Defendants' various affirmative defenses."   (Joint Mot. at 7.)

The Supreme Court has defined sham litigation as a lawsuit which is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.   *Prof'l*

---

[1] The Settlement Agreement provides that, for settlement purposes only, Defendants will agree not to challenge, disturb, or otherwise seek modification or decertification of the collective action conditionally certified by this Court's Order dated January 10, 2012, consisting of Plaintiff and 475 opt-in plaintiffs who have filed written consents to join the lawsuit (the "Settlement Collective"). (See Exhibit 1 at §§ 1, 3(a).)

*Real Estate Investors, Inc. v. Columbia Pictures Indus.,* 508 U.S. 49, 60–61 (1993).   *See also*

*Total Renal Care, Inc. v. Western Nephrology and Metabolic Bone Disease, P.C.*, 2009 WL

2596493, *9 (D. Colo. 2009).   Sham litigation by definition does not involve a bona fide

grievance.   *Protect Our Mountain Environment, Inc. v. District Court*, 677 P.2d 1361, 1369

(Colo. 1984).   The court finds that this case is not sham litigation and that it very much involves a

bona fide dispute between adversarial opponents.

>           C.        *Fair and Equitable Settlement Agreement*

As part of the Settlement Agreement in this case, Taco Bell agrees to pay a Total

Settlement Sum of $2,490,000.00. (Stlmt. Agrmt. [Doc. No. 202-1] at 5.)   After subtracting the

administrative costs associated with execution of the agreement of $85,000 (*id.* at 7), attorneys'

fees for the lawyers representing the settlement collective of no more than 33-1/3 percent of the

total [approx. $821,700.00] (*id.* at 6), costs in the amount of $ 153,496.85 (*id.*), and a service

payment to the Named Plaintiff of not more than $7,500.00 (*id.*), the remaining money in the

settlement fund (approximately $1,522,303.15) will be allocated so that each member of the class

will receive a share of the Settlement based on the number of weeks that he or she worked as a

salaried AGM compared with other eligible class members during the class period (*id.* at 9-10).

Based on the calculations set forth in the Settlement Agreement, the parties estimate that the

average gross settlement amount allocated to each class member will be approximately $5,000.00.

(Joint Mot. at 5.)   Once all payments have been processed, payments in the form of a check will

be mailed by the settlement administrator to each member of the class.   (Stmlt. Agrmt. at 10.)   In

exchange, each member of the final opt-in settlement class will dismiss his or her FLSA claims, as

well as any other wage claims that he or she may have against Defendants, for any occurrence

predating the effective date as set forth in the agreement.   (*Id.* at 13.)

      To determine whether a proposed settlement under Section 216(b) is fair and equitable to

all parties, courts have regularly applied the same fairness factors as apply to a proposed class

action settlement under Fed. R. Civ. P. Rule 23(e), which include (1) whether the proposed

settlement was fairly and honestly negotiated, (2) whether serious questions of law and fact exist

which place the ultimate outcome of the litigation in doubt, (3) whether the value of an immediate

recovery outweighs the mere possibility of future relief after protracted and expensive litigation,

and (4) the judgment of the parties that the settlement is fair and reasonable.   *Gambrell v. Weber*

*Carpet, Inc.,* No. 10–2131–KHV, 2012 WL 5306273, at *3 (D. Kan. Oct. 29, 2012); *Hobbs v.*

*Tandem Environmental Solutions, Inc.,* No. 10-1204-KHV, 2012 WL 4747166, at *2 (D. Kan.

Oct. 4, 2012); *McCaffrey v. Mortg. Sources, Corp*., No. 08–2660–KHV, 2011 WL 32436, at *5 (D.

Kan. Jan. 5, 2011).   The Court also considers various contextual factors pertinent to the statutory

purpose of the FLSA, some of which overlap with the factors listed above. These "contextual"

factors include (1) defendants' business, (2) the type of work performed by plaintiffs, (3) the facts

underlying plaintiffs' reasons for justifying their claims, (4) defendants' reasons for disputing

plaintiffs' claims, (5) the relative strength and weaknesses of plaintiffs' claims, (6) the relative

strength and weaknesses of defendants' defenses, (7) whether the parties dispute the computation

of wages owed, (8) each party's estimate of the number of hours worked and the applicable wage,

and (9) the maximum amount of recovery to which plaintiffs claim they would be entitled if they

successfully proved their claims.   *McCaffrey,* 2011 WL 32436, at *5.

The court finds that questions of law and fact exist with respect to plaintiff's claims and defendants' defenses. The parties acknowledge that these unresolved legal and factual issues place the ultimate outcome of the litigation in doubt.   The parties assert, and this court agrees, that if litigation had continued, the court would have been required to resolve several hotly contested discovery motions which could have resulted in even more extensive discovery, including Defendants' right to depose up to 48 Plaintiffs.   Other issues which would have likely come before the court if the matter was not resolved by settlement include Defendants' anticipated attacks on the viability of Plaintiffs' expert testimony, Defendants' anticipated dispositive motions including application of the fluctuating workweek to calculate damages and the doctrines of good faith and willfulness, and Defendants' potential motion for decertification.   (Joint Mot. at 10.) Further, given that Plaintiffs are not in a high wage category and some are no longer employed by Defendants, Plaintiffs faced considerable obstacles in proving both the nature and extent of Plaintiffs' individual damages.

This Settlement Agreement was the product of arm's-length negotiations by experienced counsel after a day-long mediation with qualified mediator, former federal judge Judge Edward W. Nottingham.   (Joint Mot. at 9.)   Under these circumstances, a presumption of fairness attaches to the proposed settlement.   *See Lynn's Food Stores, Inc.,* 679 F.2d at 1354 (recognizing courts rely on the adversary nature of a litigated FLSA case resulting in settlement as indicia of fairness); *see also In re BankAmerica Corp. Secs. Litig.,* 210 F.R.D. 694, 700 (E.D. Mo. 2002) ("In evaluating the settlement, the Court[] should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and

reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.").   The Court sees no evidence of fraud or collusion or any other factor which would undermine this presumption here.

Under the FLSA if they prevailed at trial, Plaintiffs would be entitled to liquidated damages in addition to compensation for back pay.   The structure of this settlement agreement provides compensation to each individual collective member in an amount based on the number of weeks they worked at least ten hours of overtime while employed as an AGM at Taco Bell, limited by the comparison in terms of number of weeks to others in the class and the monetary limitation of the almost $1.5 million cash in the fund available for distribution.   Therefore, the court finds that obtaining immediate relief through the settlement process outweighs the possible benefit to Plaintiffs of recovering a limited amount more after prolonged litigation, especially in light of the significant obstacles in the way of Plaintiffs prevailing in the case and obtaining any relief whatsoever.   Further, as pointed out by the parties, the expected recovery of approximately $5,000 for each collective action member is significantly higher than other recent chain store misclassification settlements have obtained.   (Joint Mot. at 14, collecting FLSA cases involving similar industries.)

In light of all the circumstances, and for the reasons discussed above, the Court finds that the settlement is fair and reasonable and, as set forth below, provides an adequate provision for the payment of Plaintiffs' attorney fees.

### D.    Attorney Fees

Title 29 U.S.C. § 216(b) requires that settlement agreements in FLSA cases include an award of "a reasonable attorney's fee . . . and costs of the action."

"In class actions, the district court has broad authority over awards of attorneys' fees." *Law v. Nat'l Collegiate Athletic Ass'n,* 4 F.Appx. 749, 751 (10th Cir. 2001) (citation omitted).   In common fund cases, utilizing the percentage method to calculate attorney fees awards is the standard.   *See Gottlieb v. Barry*, 43 F.3d 474, 482–83 (10th Cir. 1994); *Barr v. Qwest Communications Co., LLC*, Case No. 01-cv-00748-WYD-KLM, 2013 WL 141565, *3 -4 (D. Colo. Jan. 11, 2013).   Foremost for this court, regardless of the method used to calculate fees, is that the fees awarded must be reasonable.   *Id.* at 482 (*citing Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 853 (10th Cir.1993) (implying a preference for the percentage of the fund method.)   In all cases, whichever method is used, the court must consider the twelve . . . factors" set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) in determining the reasonableness of the fee award, including: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. "[R]arely are all of the *Johnson* factors applicable." *Uselton,* 9 F.3d at 854.

13

This Court adopts the percentage-of-the-fund approach, and finds that, taking into consideration the *Johnson* factors, the agreed upon fee and expense request is reasonable as a matter of law.   The total settlement amount in the fund is $2,490,000.00.   The attorney's fees claimed are $821,700.00 with costs of $153,496.85, for a total of fees and costs of $ 975,196.85. Together the fees and costs amount to approximately 39% of the fund as a whole.   This is within the normal range for a contingent fee award.   *See Lucken Family Ltd. Partnership, LLLP v. Ultra Resources, Inc*., Civil Action No. 09–cv–01543–REB–KMT, 2010 WL 5387559, at *5–*6 (D. Colo. Dec. 22, 2010) ("The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class.") (*citing, inter alia, Vaszlavik v. Storage Technology Corp.*, Case No. 95-B-2525, 2000 WL 1268824, *4 (D. Colo. Mar. 9, 2000) ("requested fee of 30% of the settlement is well within the ordinary range of common fund awards," and "[a] 30% common fund award is in the middle of the ordinary 20%– 50% range and is presumptively reasonable").); *Cimarron Pipeline Construction, Inc. v. National Council on Compensation*, Nos. CIV 89–822–T, CIV 89–1186–T, 1993 WL 355466, at *2 (W.D.Okla. June 8, 1993) (noting that "[f]ees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis," and finding that "attorneys' fees of 33 1/3% of the common fund created by the efforts of counsel for the Class are in line with comparable other cases, [and] consistent with prevailing case law of this circuit").   The results obtained for the collective in this case are not unduly below what class members could hope to receive upon a full victory after trial and are based upon the actual work history and hours expended by each separate class member.   The class members were not highly paid employees

14

and the expected recovery represents a significant number of overtime working hours if the AGM

had been paid in the neighborhood of $10.00 to $14.00 per hour.

As noted *infra,* Athe Plaintiffs' attorneys have spent three years just litigating this matter

not including all the preparation and investigation which went into the case in order to get to the

filing stage.   FLSA cases are not novel, but this is a specialized area of the law where some degree

of extra skill is needed to litigate, especially in a case that began as one Plaintiff with a complaint

against a mega-franchise multi-national organization.   Attorneys attempting to handle a large

class such as this are precluded by the ticking of the clock from taking certain other cases given

that they have decided to take a chance on a possible recovery in a contingent fee case rather than

strictly working on paid hourly wages.   There is, of course, the possibility in a case of this kind

that the lawyer, having given up other cases in order to actively pursue this case, will actually

recover no payment for his time and efforts.   This case involved workers who were neither highly

skilled nor highly paid, making a contingent fee arrangement even more risky since significant

volume of the opt-in collective would be needed in order to even acquire a break-even position for

the attorney.

Attorney fees of one-third of the total recovery as provided for by the settlement

agreement, and while resulting in a significant figure, is not unreasonable given the work that has

been put forth to bring this action, litigate it for three years against a motivated defendant, and

ultimately participate in lengthy and hotly contested mediation in order to resolve it short of trial.

### E.  *Personal Aggrandizement to Named Plaintiff*

The Settlement Agreement calls for a very modest service award to the named plaintiff, Jacquelyn Whittington, of $7,500.00 which she will receive in addition to her share of the net proceeds as a collective action member.   As noted repeatedly, this case has been pending for three years, during which time Ms. Whittington has remained steadfast in her dedication to pursuing the collective action.   The court finds that the service award in no way is an aggrandizement to Ms. Whittington nor is she unduly profiting at the expense of the collective.

**IT IS THEREFORE ORDERED**

The parties' "Joint Motion for Approval of Collective Action Settlement" [Doc. No. 202] is hereby is **GRANTED.**   The Court approves the parties' settlement including payment of Attorneys' Fees and Costs in the amount of $821,700.00 in fees, and costs in the amount of $153,496.85, the administration fee of $85,000.00 and the service payment to the named Plaintiff of $7,500.00, with the remainder of the total settlement amount of $2,490,000.00 to be distributed in accordance with the terms of the agreement.

This Action is DISMISSED WITH PREJUDICE with respect to all Final Settlement Collective Action Members and WITHOUT PREJUDICE with respect to any opt-in collective members who submit a timely Request for Exclusion, without costs to any Party, other than as specified in the Settlement Agreement and this Order.

16

The Clerk of the Court shall enter Judgment forthwith.

**IT IS FURTHER ORDERED**

The Parties will submit to the Court within sixty days of the closing of the administration of the settlement, a list comprising the Final Settlement Collective Action Members, as well as the names of any individuals who submitted a timely Request for Exclusion.

All pending motions in the case are rendered moot.

Dated this 13th day of November, 2013.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

17